773 A.2d 97

IN THE MATTER OF THE COMMITMENT
OF W.Z., PETITIONER–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 14, 2001—Decided April 23, 2001.

550

552

Before Judges KING, COBURN and AXELRAD.

*Joseph Donofrio,* Assistant Deputy Public Defender, argued the cause for appellant W.Z., (*Peter A. Garcia,* Acting Public Defender, attorney; *Mr. Donofrio,* of counsel and on the brief).

*Nancy Kaplen,* Assistant Attorney General, argued the cause for respondent State of New Jersey, (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Mary Beth Wood,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

I

This is an appeal from a judgment rendered under the New Jersey Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4–27.24 to –27.38, committing W.Z. to the Special Offenders Unit at the Northern Regional Unit (NRU) in Kearny. Following a commitment hearing at which testimony from experts for both sides was presented, the judge found that W.Z. poses a threat to the community because he has a mental abnormality which predisposes him to commit acts of sexual violence. In reaching this conclusion, the judge held that the SVPA is applicable to offenders such as W.Z., who have volitional control of their sexual impulses, but who otherwise lack the emotional capacity to control their dangerousness.

On appeal, W.Z. joins in the appeal brought by *R.S.*, 339 *N.J.Super.* 507, 773 *A.*2d 72 (App.Div.2001) (A–6870–99T3), which we heard on the same calendar as W.Z.'s appeal, challenging the admissibility of actuarial assessment instruments at sex offender commitment hearings. We reach the same result here as in *R.S.* and for the reasons there expressed. In addition, W.Z. raises several constitutional challenges to the SVPA. He argues that commitment must be limited to those individuals who totally lack volitional control of their violent sexual impulses, disputes the definitions of the terms "likely," "propensity" and "threat" contained in *N.J.S.A.* 30:4–27.26, and questions the meaning of "likely" in § 27.26 in light of the clear and convincing evidence standard. We find no constitutional flaws and affirm the commitment order.

II

On December 10, 1999 the Attorney General filed a petition for the civil commitment of W.Z. under the SVPA. The petition was accompanied by two clinical certificates of involuntary commitment prepared by Leonard B. Achor, M.D., and James R. Varrell, M.D.,

certifying that W.Z. is a violent sexual offender who suffers from a mental abnormality or personality disorder which makes him likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment. On December 10, 1999 W.Z. was temporarily committed to the NRU until a final hearing on the issue of the continuing need for involuntary commitment as a sexually violent predator.

At the final commitment hearing before Judge Philip M. Freedman on April 17 and 19, 2000 the State presented testimony from two expert witnesses; W.Z. presented testimony from one expert witness, himself and his father. The judge rendered his final decision on June 14, 2000 concluding that W.Z. is a violent sexual predator. Judge Freedman entered a judgment on June 29, 2000 committing W.Z. to the NRU and scheduled a review hearing for April 19, 2001.

### III

On January 27, 1995 W.Z. was sentenced to eighteen months in the New Jersey State Prison for fourth-degree criminal sexual contact, five years for making terroristic threats, and five years for aggravated assault. These three sentences were imposed concurrently. When W.Z. served his maxim sentence, he was temporarily committed to the NRU on December 13, 1999.

W.Z., born on June 10, 1966, has an extensive criminal and juvenile history starting at age twelve. W.Z. was adjudicated a juvenile delinquent for offenses that included possession of marijuana (two counts), assault and battery, joyriding (three counts), larceny, theft (four counts), driving without a license (three counts), criminal trespass, eluding a police officer (two counts), aggravated assault (three counts), criminal sexual contact, burglary (three counts), receiving stolen property, obstructing the administration of a law, disorderly conduct (two counts), terroristic threats (two counts), resisting arrest and drinking in public. W.Z. was incarcerated at the Youth Correctional Facility at Jamesburg several times between 1978 and 1984. As an adult, W.Z. incurred

convictions for simple assault (four counts), resisting arrest (four counts), receiving stolen property, burglary (two counts), aggravated assault (three counts), terroristic threats (three counts), eluding a police officer, attempted sexual assault, and criminal sexual contact.

W.Z.'s first sexual offense occurred in 1982 at age 16 when he suddenly beat-up a female whom he said he was "comforting" after a man hit her. W.Z. denied sexually assaulting the victim and blamed the incident on LSD he said was put into his drink at a party. He was sent to the reformatory at Jamesburg for aggravated assault and criminal sexual conduct.

W.Z.'s second sexual offense occurred in 1989 when he physically assaulted and attempted to rape a woman he met in a bar. After they left the bar, W.Z. grabbed the woman in a headlock, dragged her into the woods, repeatedly punched her in the face, and choked her until she passed out. W.Z. then began removing the woman's clothing, but was frightened away by the police before raping her. W.Z. also denied assaulting this victim, saying that she agreed to have sex with him, but that she got nasty and he had to defend himself.

W.Z.'s more recent conviction for criminal sexual contact resulted after he accosted a woman at a train station, lifted her skirt above her head, and grabbed her buttocks. W.Z. stated that he was drunk at the time of this incident and has no recollection of what took place.

During his five-year incarceration, W.Z. received fifteen institutional disciplinary charges, including charges for refusing to obey, lying to officers, encouraging group demonstrations, threatening bodily harm, fighting, assault with a weapon and disruptive conduct. W.Z. testified that one of the charges resulted in his placement in administrative segregation for eighteen months. W.Z. attempted suicide while in prison, necessitating psychiatric hospitalization.

W.Z. was evaluated at the Adult Diagnostic Treatment Center in Avenel in 1991, following his conviction for attempted sexual assault and aggravated assault. Dr. Kenneth McNiel, who conducted the examination, reported that W.Z.'s abstract-reasoning potential fell within the 84th percentile, with a full scale I.Q. of 108, placing him within the average range of intellectual functioning. McNiel wrote that his clinical impression of W.Z. was of "an antisocial personality disorder with narcissistic features. Issues of clinical concern include interpersonal exploitiveness, lack of empathy for others, hedonistic self-indulgence, violence potential and anger towards women." This sexual assault "was more an act of antisocial violence and impulsive exploitation than an act of sexual compulsivity." Curiously, allegedly because W.Z. did not exhibit a pattern of repetitive, compulsive sexual behavior, McNiel concluded that he was not eligible for sentencing under the purview of the New Jersey Sex Offender Act, *N.J.S.A.* 2C:47–1 to –10.

On December 9, 1999 Dr. Achor prepared a clinical certificate in which he described W.Z. as "uncooperative," "agitated" and in a "depressed, angry" mood. Achor diagnosed W.Z. as suffering from episodic alcohol dependence, depression and mixed personality disorder. In a clinical certificate prepared on December 10, 1999 Dr. Varrell similarly noted W.Z.'s lack of cooperation and arrived at a diagnosis of dysthymia, alcohol dependence in remission, intermittent explosive disorder, and antisocial personality disorder.

Shortly after arriving at the NRU, W.Z. was evaluated by Dr. Jackson Tay Bosley, a psychologist employed by the Division of Mental Health Services. Bosley conducted two interviews of W.Z. and reviewed available records. However, because W.Z. refused to cooperate with the assessment procedures, reportedly under the advice of his attorney, Bosley felt that little information was obtained from the interviews. Bosley wrote that "the guiding principle in [W.Z.'s] life appears to be 'I do what I like without considering the costs'" and concluded that W.Z.'s primary diagnosis was antisocial personality disorder. Bosley also noted that

"[a]lthough [W.Z.] denies any participation in racist organizations, his correspondence with the leader of a white supremacist organization, and instructions to create a secret cell (and obtain handguns) causes some concern. His intelligence and grandiosity also make these kinds of plans worrisome."

At the commitment hearing, the State presented testimony from Bosley and Dr. Stanley Kern, a psychiatrist employed by the NRU. W.Z. presented testimony from Dr. Anthony Vincent D'Urso, a licensed clinical psychologist and assistant professor at Montclair State University. The testimony of these experts was surprisingly consistent and raised few issues of fact.

Kern diagnosed W.Z. as suffering from intermittent explosive disorder, alcohol abuse and an antisocial personality disorder with narcissistic tendencies. Kern testified that W.Z. needed to be retained at the NRU because his mental disorder affects his emotional and volitional functions causing him to behave in an antisocial fashion and present a danger to society.

Bosley testified that W.Z. was not suffering from any sort of paraphilia or sexual compulsion. W.Z. could have chosen not to act in the way he did, but instead he made a conscious choice to hurt his victims sexually and to use sex as a weapon. W.Z. does not have the ability to control his antisocial personality and poses a risk for future sexually-offensive behavior based upon his past acts, his inability to recognize his problem, and his disregard for the welfare of females.

The results of several actuarial risk assessment instruments were introduced into evidence at the commitment hearing. Bosley discussed the results of the Minnesota Sex Offender Screening Test Revised (MnSOST–R), the California Actuarial Risk Assessment Tables (CARAT), the Adult Sex Offender Risk Assessment Schedule (ASORAS), the New Jersey Registrant Risk Assessment Scale (RRAS) and the Static 99. W.Z. ranked in the high-risk category on all of the instruments except the RRAS where he fell into the moderate risk category.

Bosley explained that he used so many different tools in the evaluation because it is helpful to get as much information as possible. He said the fact that most of the tools support a picture of a very high risk individual is meaningful. If there had been a wide discrepancy in the results, Bosley would have been less sure of his determination.

D'Urso summarized W.Z.'s psychological profile as follows:

[W.Z.] had a tendency to deny and minimize his prior offenses. But despite that attempt at—at minimizing on test[s] his dynamics reflect a highly impulsive, immature, hedonistic adult. He obviously has problems with authority; has been aggressive and hostile in the past. He does not appear to learn from some of those antisocial behaviors. He tends to be somewhat exploitive and self-centered. He has his own—as all of us do—set of needs but his reaction into not getting his needs met tends to be somewhat aggressive. He uses his aggression instrumentally, purposefully to get people to do what he wants.

It does not appear that he's had sustained relationships, intimate relationships with people. He's demonstrated little patterns of remorse. His profile did not reflect obsessive and compulsive sexual thoughts. He did not appear to have any confusion, thought disorder, hallucinations, delusions that would suggest that he couldn't control his impulses. His insight into his own behavior and motivation for change are poor. He doesn't seem to have anticipatory judgment looking at situations and anticipating what frustrations can occur in anticipating his own reactions.

D'Urso explained that W.Z.

has a personality disorder. Personality disorders are characteristic ways of functioning in the world.... In his case an antisocial personality disorder says that he tends to violate the rules of others. But that disorder is not the same type of involitional behavior that biologic depression would show, psychosis, bipolar disorder, which tend to be biochemical disorders.... So in that sense this personality disorder, antisocial personality disorder, is not a mental incapacity. It is descriptive of a way people act in society.

D'Urso did not dispute Bosley's testimony and in fact agreed that W.Z. presents a high risk for repeating his aggressive, antisocial conduct. Because W.Z. had used sex as a weapon in the past, D'Urso agreed that he might use it that way again in the future.

While D'Urso was testifying, the judge interjected, "I don't think there's much dispute between you and Dr. Bosley here at all," to which D'Urso replied, "I don't think so." The judge then observed that "[t]he dispute is whether this gentleman is covered or not by the statute.... Are they [the Legislature] dealing with

every violent person who happens to have committed sex offenses amongst his violence?" D'Urso then explained the issue as centering upon the distinction between a person who has a compulsion to commit sex offenses and recruits victims and a person who is situational and opportunistic but not selective to a particular type of victim. The later type of person does not perform sexually violent acts any more frequently than any other antisocial act in his regimen.

Judge Freedman reviewed the legal underpinnings of the SVPA and civil commitment, W.Z.'s criminal history, and the testimony of the experts at the hearing. He summarized the issue before the court this way:

In his particular case, the respondent contends that he's not subject to the Sexually Violent Predator Statute, because he does not suffer from an obsessive sexual compulsion and doesn't have a deviant sexual arousing pattern and has volitional control over his sexual behavior. And there's also no evidence in the case that respondent suffers from any paraphilia. His position [is] that under the U.S. Constitution in order to involuntarily commit a person that person must be proven to be unable to control his sexual dangerousness.

The judge rejected this argument, saying that there is no indication that the SVPA is limited to individuals who cannot control their sexual compulsions. He observed that the Legislature could have limited the statute to repetitive compulsive offenders since it used those terms in the area of sex offender sentencing, but those terms are not used in the SVPA.

Judge Freedman stated that

[b]ased on this evidence, it's clear to me that [W.Z.] has a mental abnormality that does effect his emotional capacity so as to predispose him to commit acts of sexual violence. Despite the unanimous testimony of the three experts that he can control his sexual acts, his record indicates that he can't. His own testimony in this matter indicates that he can't.

The judge then concluded that W.Z. had been convicted of a sexually violent crime, is suffering from a mental abnormality or personality disorder, and is likely to engage in acts of sexual violence if not confined in a secure facility for treatment. He ruled that W.Z. should be committed to the NRU.

## IV

W.Z. challenges the admission of actuarial risk assessment instruments at his SVP commitment hearing and joins in the merits brief filed on behalf of R.S. in *In the Matter of the Commitment of R.S.,* 339 *N.J.Super.* 507, 773 *A.*2d 72 (App.Div. 2001) (A–6870–99T3). The issue raised here by W.Z. is identical to that raised by R.S. and the matters were jointly calendared. We approve the admissibility of actuarial instruments for the reasons stated in *R.S.*

## V

W.Z. argues substantive due process requires that a sex offender must be unable to control his dangerousness before he can be committed pursuant to the SVPA. W.Z. contends that this "uncontrollable dangerousness" requirement was established by the United ed States Supreme Court in *Kansas v. Hendricks,* 521 *U.S.* 346, 117 *S.Ct.* 2072, 138 *L. Ed.*2d 501 (1997) (5–4 decision); *see also Seling v. Young,* 531 *U.S.* 250, 121 *S.Ct.* 727, 148 *L.Ed.*2d 734 (2001). Because expert testimony at his commitment hearing established that he had volitional control of his sexual impulses, W.Z. argues that he is not subject to commitment under the SVPA. W.Z. does not contend that the language of the SVPA or the intent of the Legislature requires uncontrollable dangerousness. Rather, he contends that this is a requirement imposed solely by State and federal substantive due process concepts.

The State, also noting that the clear language of the SVPA allows for the commitment of a sexually dangerous predator even if he does not suffer from a total lack of volitional control, contends that *Hendricks* does not require a total lack of volitional control and that the SVPA fully complies with *Hendricks'* substantive due process requirements.

The SVPA defines a "sexually violent predator" as

a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and

*suffers from a mental abnormality or personality disorder that makes the person*
*likely to engage in acts of sexual violence* if not confined in a secure facility for
control, care and treatment.

[*N.J.S.A.* 30:4–27.26(b) (emphasis supplied)].

A "mental abnormality" is defined as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." *N.J.S.A.* 30:4–27.26. " 'Likely to engage in acts of sexual violence' means the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *Ibid.*

█ The text of the SVPA makes clear that the Legislature focused on the potential of an individual to commit acts of sexual violence, irrespective of whether the violence arises from an impairment in emotional, cognitive or volitional capacity. This legislative intent is even more apparent when the SVPA is compared to other statutes, such as the Adult Diagnostic and Treatment Center (ADTC) sentencing statute, *N.J.S.A.* 2C:47–1 to –10 (Sex Offender Act), where the Legislature has required a finding of "repetitive, compulsive behavior" before an offender can be sentenced to the ADTC. *See N.J.S.A.* 2C:47–3(b). The absence of such language in the SVPA evinces the Legislature's intent that commitment for control, care and treatment under the SVPA not necessarily be conditioned exclusively upon a finding of compulsive behavior. There is no real dispute concerning W.Z.'s diagnosis. All the experts agreed that W.Z. has some degree of alcohol dependence and an antisocial personality disorder. They all agreed that he has the volitional capacity to control his sexual impulses, if he chooses to do so, but that he does not so choose. And they all agreed that W.Z. has a problem controlling his anger, a condition described by Dr. Kern as "intermittent explosive disorder." The only question for resolution is whether substantive due process prohibits the State from involuntarily committing a sex offender who has the capacity of volitional control over his sexually violent acts but selectively chooses not to exercise such control.

The leading authority is *Kansas v. Hendricks* in which the United States Supreme Court in 1997 held that the definition of mental abnormality contained in the Kansas Sexually Violent Predator Act, (KSVPA), *Kan. Stat. Ann.* § 59–29a01 to –29a20 (1994), did not violate the requirements of substantive due process. The KSVPA's definition of "mental abnormality," although not identical to New Jersey's, is very similar: " '[m]ental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." *Kan. Stat. Ann.* § 59–29a02(b) (1994).

The Court recognized that although freedom from physical restraint is at the core of the liberty interest protected by the Due Process Clause, it may be overridden when necessary to promote the common good. *Hendricks,* 521 *U.S.* at 356–57, 117 *S. Ct .* at 2079, 138 *L. Ed.*2d at 512. The Court observed that involuntary civil detention of persons who are unable to control their behavior and who pose a danger to public health and safety has been upheld "provided the confinement takes place pursuant to proper procedures and evidentiary standards." *Id.* at 357, 117 S.Ct. 2072.

Concerning the KSVPA, the High Court said:

A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." *See, e.g., Heller* [*v. Doe,* 509 *U.S.* 312], 314–315, 113 *S.Ct.* [2637,] 2639–2640 (Kentucky statute permitting commitment of "mentally retarded" or "mentally ill" and dangerous individual); *Allen v. Illinois,* 478 *U.S.* 364, 366, 92 *L.Ed.*2d 296, 106 *S.Ct.* 2988, 2990–2991 (1986) (Illinois statute permitting commitment of "mentally ill" and dangerous individual); *Minnesota ex rel. Pearson v. Probate Court of Ramsey Cty.,* 309 *U.S.* 270, 271–272, 84 *L.Ed.* 744, 60 *S.Ct.* 523, 524–525 (1940) (Minnesota statute permitting commitment of dangerous individual with "psychopathic personality"). *These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.* The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality" or "personality disorder" that makes it difficult, if not impossible, for the person to

control his dangerous behavior. The precommitment requirement of a "mental abnormality" or "personality disorder" is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.

[*Id.* at 358, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 512–13 (citations omitted)(emphasis added).]

The Court found that the KSVPA satisfied due process requirements because it combines proof of a mental abnormality with proof of dangerousness. The language of the *Hendricks* decision is somewhat confusing, because in our underlined portion of the above quote the Court seemed to be implying that the mental-abnormality component is limited to a volitional impairment which renders individuals dangerous beyond control. However, that plainly cannot be the Court's meaning because it was reviewing a statute which defines mental abnormality as a condition affecting either volitional *or* emotional capacity. The Court never specifically found that the Kansas statute, as written, was either unconstitutional or that the term "emotional" in the definition was meaningless.

Rather, a more reasonable interpretation of the underlined passage is: it is a characterization of those civil commitment statutes to which the Court had just referred. The Court then immediately stated that the KSVPA is "plainly of a kind" with those other statutes. In other words, the KSVPA is not identical to the previously referenced and approved statutes because it adds emotional impairment as a way to render a person dangerous beyond control, but the difference does not matter since the KSVPA still narrowed the class of persons eligible for confinement to those who fail to control their dangerousness because of mental abnormality or illness.

This interpretation is consistent with later portions of the decision holding that state legislatures have broad discretion in defining mental health concepts. *Id.* at 359–60, 117 *S.Ct.* at 2081, 138 *L.Ed.*2d at 513. Thus, the definition of "mental abnormality" chosen by the Kansas legislature need not be identical with definitions chosen by other legislatures. The important consider-

ation, as the Court clearly stated, is that the criteria relating to an individual's inability to control his dangerousness that are set forth in the KSVPA are comparable to the criteria that were set forth in civil commitment statutes upheld in the past. *Id.* at 360, 117 *S.Ct.* at 2081, 138 *L.Ed.*2d at 514.

Another passage from the Court's opinion which W.Z. quotes as supportive of his position states that Hendricks' "admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Ibid.* W.Z. argues that this statement limits involuntary commitments to those individuals who lack volitional control and who are predicted to be dangerous in the future. This is not what the Court said at all. Prior to making this statement, the Court reviewed the specific facts of the Hendricks case. The Court noted that Hendricks had a volitional impairment because he could not control his urge to molest children. *Ibid.* The Court then made the case-specific statement that Hendricks' lack of volitional control coupled with his future dangerousness made him eligible for commitment. *Ibid.* Thus, the Court was making a finding as to respondent Hendricks himself. We do not interpret this as a holding that a person with an established *emotional* impairment which predisposes him to commit acts of sexual violence is not subject to commitment.

The essential rule we glean from *Hendricks* is that a state SVP statute will be upheld if it conditions commitment on proof of a mental abnormality that results in an inability to control sexually dangerous behavior. We conclude that the Court specifically held a definition of mental abnormality predicated upon emotional or volitional impairment is acceptable under a due process analysis. Our interpretation is supported by an important case, not cited by either party, *In re Linehan,* 594 *N.W.*2d 867 (Minn.), *cert. denied,* 528 *U.S.* 1049, 120 *S.Ct.* 587, 145 *L. Ed.*2d 488 (1999) (*Linehan II* ). In *Linehan II,* the Minnesota Supreme Court directly addressed the question of whether *Hendricks* requires that a person have an

utter inability to control his sexual impulses before he can be committed. *Id.* at 872. The Minnesota Sexually Dangerous Persons Act defines a sexually dangerous person as one who "(1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct." *Id.* at 874 (citing *Minn.Stat.* § 253B.02, subd. 18c(a) (1999)). Like the KSVPA, the Minnesota Act requires past harmful sexual behavior and a present mental disorder which makes future dangerous conduct highly likely. *Id.* at 874. However, unlike the KSVPA, "the Minnesota Act explicitly states that 'it is not necessary to prove that the person has an inability to control the person's sexual impulses.'" *Ibid.* (citing *Minn.Stat.* § 253B.02, subd. 18c(b) (1999)). The Minnesota court held that the Minnesota Act is in accord with *Hendricks* because it "allows civil commitment of sexually dangerous persons who have engaged in a prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses." *Id.* at 876. Three justices dissented from this conclusion, *id.* at 878–87, and the United States Supreme Court denied certiorari.

Thus, W.Z. is partially correct when he states that *Hendricks* requires a person subject to commitment must to be unable to control his dangerousness. However, he is in error when he equates dangerousness with volition alone and claims that a person subject to commitment must have a total lack of volitional control. Under the SVPA, a person may be deemed to have a mental abnormality that results in his inability to control his dangerousness in one of three different ways: an emotional impairment, a cognitive impairment, or a volitional impairment. *N.J.S.A.* 30:4–27.26. While each type of impairment is distinct, their effect can be the same. A person with a volitional impairment might suffer from a sexual compulsion such that he can not control his actions. A person with an emotional impairment might be subject to fits of anger or meanness so extreme that he can not

control his actions. A person with a cognitive impairment might suffer from hallucinations or diminished perceptions such that he can not control his actions. The key here is that any of these conditions might predispose a person to commit acts of sexual violence.

The SVPA is constitutional under *Hendricks* because, like the KSVPA, it narrows the class of persons eligible for confinement to those who are demonstrably unable to control their dangerousness through mental abnormality. Also like the KSVPA, the SVPA defines mental abnormality as a condition affecting a person's emotional or volitional capacity in a manner that predisposes him to sexual violence. Although the SVPA also includes impaired cognitive capacity as a condition which might predispose a person to sexual violence, this additional element does not change the scope of the statute, which we find is well within the Legislature's ample discretion to define mental abnormality.

In support of his interpretation of *Hendricks*, W.Z. relies heavily upon a decision from the Kansas Supreme Court, *In re Crane*, 269 *Kan.* 578, 7 *P.*3d 285 (2000), *cert. granted, Kansas v. Crane*, —— *U.S.* ——, 121 *S.Ct.* 1483, 149 *L.Ed.*2d 372 (2001). In *Crane*, the offender had been diagnosed with exhibitionism and an antisocial personality disorder, "which by definition does not include a volitional impairment." *Id.* at 287; at 290. The Kansas court characterized the issue presented as "whether it is constitutionally permissible to commit Crane as a sexual predator absent a showing that he was unable to control his dangerous behavior." *Id.* at 287. Noting that under the statute a mental abnormality could affect either emotional or volitional capacity, the court stated:

Volitional capacity is the capacity to exercise choice or will; a condition affecting the capacity to exercise choice or will in this context would be one that adversely affected the capacity, thereby rendering the person unable to control his or her behavior. The legislature identified emotional capacity as an alternative faculty that could be affected by the condition. Logic would seem to dictate that the alternative to a capacity involving the exercise of will is one in which the exercise of will is not at issue. Thus, a condition affecting that faculty would not necessarily remove the person's ability to control his or her behavior. It seems, therefore, that

the result of the legislature's identifying emotional capacity as well as volitional capacity in the definition of mental abnormality was to include a source of bad behavior other than inability to control behavior.

[*Id.* at 289.]

■ This reasoning to us is unconvincing. There is no particularly logical reason to assume that an alternative must be an opposite. The ability to control one's behavior can depend both upon volitional capacity and emotional capacity or upon either separately. In fact, neither "volitional capacity" nor "emotional capacity" has any "talismanic significance," but rather lies within the discretion afforded a state legislature to define mental health terms. *Hendricks,* 521 *U.S.* at 359, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 513. Moreover, the effect of the quoted passage in *In re Crane* is to nullify language intentionally written into the statute by the state legislature. In New Jersey, we must avoid statutory construction which renders part of a statute "inoperative, superfluous or meaningless." *New Jersey Carpenters v. Borough of Kenilworth,* 147 *N.J.* 171, 179–80, 685 *A.*2d 1309 (1996), *cert. denied,* 520 *U.S.* 1241, 117 *S.Ct.* 1845, 137 *L. Ed.*2d 1048 (1997).

The Kansas Supreme Court concluded:

A fair reading of the majority opinion in *Hendricks* leads us to the inescapable conclusion that commitment under the Act is unconstitutional absent a finding that the defendant cannot control his dangerous behavior. To conclude otherwise would require that we ignore the plain language of the majority in *Hendricks.* Justice Thomas, speaking for the majority, stated that to be constitutional, a civil commitment must limit voluntary impairment to those "who suffer from a volitional impairment rendering them dangerous beyond their control."

[*Crane,* 7 *P.*3d at 290 (citation omitted).]

The first two sentences of this passage are clearly true, as discussed earlier. The last sentence, however, takes Justice Thomas' characterization of previously upheld commitment statutes out of context to create a general rule to our view never intended by the decision. Because we find the reasoning of *In re Crane* unpersuasive, we decline to adopt its conclusion that total lack of volitional control is required before an individual can be committed pursuant to the SVPA.

W.Z. also cites several New Jersey decisions to support his argument that civil commitment violates due process protections. There is no question but that commitment effects a great restraint on individual liberty which triggers significant due process requirements. *In re Commitment of S.L.*, 94 *N.J.* 128, 137, 462 *A.*2d 1252 (1983); *In re Commitment of Raymond S.*, 263 *N.J.Super.* 428, 431, 623 *A.*2d 249 (App.Div.1993). "In order to justify commitment in New Jersey the State must show that an individual is likely to pose a danger to self or others or property by reason of mental illness." *S.L.*, 94 *N.J.* at 138, 462 *A.*2d 1252. A defendant may be committed only if he has been determined to be both mentally ill and dangerous to himself or to society. *State v. Krol*, 68 *N.J.* 236, 253, 344 *A.*2d 289 (1975).

While *S.L.*, *Raymond S.* and *Krol* all involved civil commitment under the general mental health statutes and not the SVPA, the SVPA is consistent with the holdings and doctrine expressed in these cases. Before an individual can be involuntarily committed under the SVPA, the State must establish by clear and convincing evidence that he suffers from a mental abnormality or personality disorder which makes him likely to engage in acts of sexual violence if not confined. *N.J.S.A.* 30:4–27.26; *N.J.S.A* . 30:4–27.32(a). We find the SVPA is in accord with both State and federal substantive due process law.

Finally, W.Z. argues that "failure to limit commitments to only those who suffer from a lack of volition would require the statute to be voided for over breadth." W.Z. does not further explain or support this argument, however, and we find it difficult to see how it applies in this situation. A statute is overbroad if its reach extends too far in fulfilling the State's interest. *State v. Lee*, 96 *N.J.* 156, 165, 475 *A.*2d 31 (1984). The SVPA applies only to convicted sex offenders who suffer from a mental abnormality or personality disorder which makes them likely to reoffend in the future. Including emotional and cognitive impairments in the definition of mental abnormality does not make the statute overbroad. Rather, it clarifies and refines the ways in which a mental

abnormality might manifest itself. Again, as in *Hendricks,* it is the inability to control dangerousness that ultimately defines the reach of the SVPA.

For these reasons, W.Z.'s argument that an individual must suffer from a total lack of volitional control before subject to commitment under the SVPA is rejected. Judge Freedman's decision to commit W.Z. because he suffers from a mental abnormality that affects his emotional capacity in such a manner as to predispose him to commit acts of sexual violence is upheld.

## VI

W.Z. next argues that the SVPA's failure to completely mirror the language of the general commitment statute, *N.J.S.A.* 30:4–27.1 to –27.23, concerning degree of likelihood of danger and time-frame renders it void under substantive due process requirements. W.Z. further contends that the language of the SVPA, particularly the terms "likely," "threat," and "propensity," is unconstitutionally vague.

The State responds that the Legislature was well aware of the provisions of the general commitment statute when it drafted the SVPA but intentionally changed the standard for commitment based upon the serious nature of sex offenses and the different treatment needs of sex offenders. The State asserts that the SVPA is not unconstitutionally vague, because the words used in the statute have ordinary, well-understood meanings.

In order to be committed under the SVPA, a sex offender must suffer from a mental abnormality or personality disorder which makes him likely to engage in acts of sexual violence if not confined. *N.J.S.A.* 30:4–27.26. The phrase "likely to engage in acts of sexual violence" is defined as "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *Ibid.* This dangerousness standard differs from that contained within the general civil commitment statute, *N.J.S.A.* 30:4–27.2(i), which defines dangerous as a "substantial likelihood that the person will inflict serious

bodily harm upon another person ... within the reasonably foreseeable future."

Clearly, the Legislature intended the criteria for commitment under these two statutes should differ. The SVPA was modeled after the general civil commitment statute to an extent. Many of the procedural requirements are the same for both types of commitment.[1] *See In re Commitment of M.G.*, 331 *N.J.Super.* 365, 376–77, 751 *A.*2d 1101 (App.Div.2000) (noting that the SVPA mirrors the involuntary commitment statute in permitting a probable cause hearing without notice and a temporary commitment pending the final hearing). Yet, the Legislature did not adopt the general civil commitment statute's requirement that there be a "substantial likelihood" of serious harm within the "reasonably foreseeable" future before commitment is appropriate. Rather, under the SVPA sexually violent acts must be "likely" and there is no specific time-frame reference. "Under the established canons of statutory construction, where the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *GE Solid State, Inc. v. Director, Div. of Taxation*, 132 *N.J.* 298, 308, 625 *A.*2d 468 (1993). Thus, we will not read the SVPA strictly to require that a person be

---

[1] In certain ways, the SVP Act was modeled after the general civil commitment statute and contains identical language, particularly with respect to the procedure for commitment. *Compare N.J.S.A.* 30:4–27.10(d) and *N.J.S.A.* 30:4–27.28 (authorizing the Attorney General to initiate proceedings under each Act and requiring the court to grant an application to compel a psychiatric evaluation if it finds reasonable cause to believe the person may be in need of commitment); *N.J.S.A.* 30:4–27.10(f) and *N.J.S.A.* 30:4–27.28(f) (requiring the court to immediately review the paper submitted in order to determine if probable cause had been established); *N.J.S.A.* 30:4–27.12(a) and *N.J.S.A.* 30:4–27.29(a) (requiring a final hearing within twenty days); *N.J.S.A.* 30:4–27.14 and *N.J.S.A.* 30:4–27.29 (setting forth the rights of persons subject to commitment under each Act); *N.J.S .A.* 30:4–27.13(a) and *N.J.S.A.* 30:4–27.30(a) (requiring that notice be provided ten days prior to the final hearing); *N.J.S.A.* 30:4–27.13(b) and *N.J.S.A.* 30:4–27.30(b) (requiring that a psychiatrist on the person's treatment team testify at the final hearing); *N.J.S.A.* 30:4–27.15(a) and *N.J.S.A.* 30:4–27.32(a) (requiring the court to find, by clear and convincing evidence, that the person is in need of commitment).

"substantially likely" to engage in sexually violent acts in the reasonably foreseeable future.

The heart of W.Z.'s argument rests on the Court's decision in *State v. Krol*, 68 *N.J.* at 245, 344 *A.2d* 289, in which Justice Pashman analyzed the requirements for involuntary civil commitment under the due process and equal protection clauses of the federal constitution. First, our Court established that before a person can be committed, he must be determined to be both mentally ill and dangerous to himself or to society. *Id.* at 252–53, 344 A.2d 289. The Court recognized the difficulties inherent in establishing a standard for commitment based on dangerousness as well as mental illness, because "[d]angerousness is a concept which involves substantial elements of vagueness and ambiguity." *Id.* at 258, 344 A.2d 289. The Court stated that

Commitment requires that there be a substantial risk of dangerous conduct within the reasonably foreseeable future. *Evaluation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place.* It is not sufficient that the state establish a possibility that defendant might commit some dangerous acts at some time in the indefinite future. The risk of danger, a product of the likelihood of such conduct and the degree of harm which may ensue, must be substantial within the reasonably foreseeable future. On the other hand, certainty of prediction is not required and cannot reasonably be expected.

[*Id.* at 260, 344 A.2d 289 (citations omitted) (emphasis added).]

Significantly, in the emphasized portion of the quotation, the Court observed that the magnitude of the risk is dependent upon both the likelihood of the conduct and the seriousness of the harm. In the general civil commitment context of *Krol*, the harm that might ensue if a dangerous person is not confined can vary greatly from mere nuisance-type property damage to serious bodily injury or death. *Id.* at 259, 344 A.2d 289. Thus, by requiring that the magnitude of the risk be substantial and defining risk as the product of likelihood and severity, the Court established a flexible formula to use in deducing the minimum standard for commitment: either there must be a finding of great likelihood of harm coupled with a small to moderate degree of seriousness, or there

must be a finding that harm is more likely than not coupled with a high degree of seriousness.

In the context of sex-offender commitment such a carefully crafted formula is not necessary. Crimes of sexual violence are, by their very nature, extremely serious. Thus, in order for there to be a substantial risk, all that is required is a finding that harmful conduct is likely. This is precisely the requirement imposed by the SVPA. For this reason, the SVPA is consistent with the constitutional requirements set forth in *Krol.*

Although the SVPA does not specifically require that the threat an individual poses to the health and safety of others be within the *reasonably foreseeable future,* it is obvious from the literature that all predictors of future dangerousness are cognizant of the effect time has on their assessments. Mental health professionals apply their knowledge and experience of how sex offenders act over time to reach a clinical judgment about an individual committee. Actuarial instruments have an advantage over clinicians because they set forth clearly the specific time periods over which they are predictive. Ultimately, the court must consider the evidence and reach a decision concerning an individual's risk of recidivism. In so doing, the court must weigh the time frames considered by the actuarial instruments and the experts against the attenuating effect that time has on any prediction of the future.

Judge Freedman applied a "reasonably foreseeable" standard in reaching his decision. This is an acceptable standard constitutionally. In reviewing the evidence concerning W.Z., the judge commented that the question regarding what constitutes a reasonably foreseeable time frame was a serious one. He then stated he was satisfied that the time periods addressed by the actuarial instruments are within the constitutional limit of reasonably foreseeable. Thus, the trial judge clearly rendered his decision pursuant to the standard proposed by W.Z., reasonable foreseeability.

Further, the judge's conclusion that the five-year and ten-year time-frames established by the actuarial instruments consti-

tute what is "reasonably foreseeable" is itself both reasonable and eminently practical. As discussed in *R.S.*, actuarial instruments provide some reliable information concerning a sex offender's risk of future dangerousness. They report the information for specific time frames which vary depending upon the instrument used. If the court has reliable risk assessment information for a five-year or ten-year time period, any time within that period constitutes the reasonably foreseeable future. *See also In re Registrant J.M.,* —— *N.J.* ——, —— *A.*2d —— (2001) (decided March 2, 2001) (slip op. at 14–18).

W.Z.'s next claims that the language of the SVPA is impermissibly vague, because crucial terms such as "likely," "propensity" and "threat" are undefined. "Vagueness 'is essentially a procedural due process concept grounded in notions of fair play.' " *State v.. Lee,* 96 *N.J.* 156, 165, 475 *A.*2d 31 (1984). Laws which do not provide adequate notice of their scope and sufficient guidance for their application are constitutionally banned. *In re Commitment of N.N.,* 146 *N.J.* 112, 126, 679 *A.*2d 1174 (1996). Those who are responsible for the administration of a law should not have to "guess at its meaning and differ as to its application." *Ibid.,* quoting, *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 1688, 29 *L.Ed.*2d 214, 217 (1971). In interpreting words used in a statute, "the basic rule is that the statutory language should be given its ordinary meaning absent specific intent to the contrary." *Mortimer v. Board of Review,* 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985). When examining statutory language for vagueness, the test is whether a person of average intelligence comprehends the meaning of the words. *State v. Afanador,* 134 *N .J.* 162, 171, 631 *A.*2d 946 (1993).

Under these standards, we conclude the SVPA is not unconstitutionally vague. "Likely," "propensity" and "threat" are all words of common usage that are given their ordinary, every day meaning in the SVPA. "The utterance of any of those expressions certainly would not send the average citizen scrambling for a dictionary." *Ibid.*

Sexually violent predator laws similar to the SVPA have been challenged for vagueness without success in a number of jurisdictions. The Florida Court of Appeals carefully examined a vagueness challenge to the term "likely" as used in the phrase "likely to engage in acts of sexual violence" in *Westerheide v. Florida*, 767 *So.*2d 637, 650–53 (Fla.Dist.Ct.App.2000), *review granted*, 786 *So.*2d 1192 (2001). After reviewing several dictionary definitions of the term, the court cited cases from Arizona, California and Washington rejecting arguments that the term "likely" is unconstitutionally vague. *Id.* at 650–52. The Florida court also recognized that the United States Supreme Court has consistently upheld civil commitment statutes where danger is expressed in terms of a "probability," "threat" or "likelihood." *Id.* at 652, n. 13 (citing *Heller v. Doe*, 509 *U.S.* 312, 317–18, 113 *S.Ct.* 2637, 2641, 125 *L. Ed.*2d 257, 268–69 (1993)). The Florida court then concluded that

the term "likely" as used in the terminology "likely to engage in acts of sexual violence" is a widely used term that is commonly understood by men and women of common intelligence to mean highly probable or probable and having a better chance of existing or occurring than not. The meaning of "likely" is sufficiently clear and definite to avoid guessing or speculation concerning its intended meaning under the Act.

[*Westerheide*, 767 *So.*2d at 652–53.]

In *Martin v. Reinstein*, 195 *Ariz.* 293, 987 *P.*2d 779, 803 (Ct.App.1999), the court similarly found that the term "likely" is a reasonably understood word that is used often and effectively in statutes. The court quoted *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 *U.S.* 548, 578–79, 93 *S.Ct.* 2880, 2897, 37 *L. Ed.*2d 796, 816 (1973), for the proposition that limitations in the English language inevitably result in disputes regarding the meaning of words, particularly by those intent on finding fault at any cost. 987 *P.*2d at 803. The important consideration is whether an "ordinary person exercising ordinary common sense" can understand the term in question. *Ibid.*

We find the words "likely," "propensity" and "threat" are reasonably understood terms used in their ordinary sense in the SVPA such that a person exercising common sense can under-

stand them. We reject W.Z.'s "void for vagueness" challenge to the SVPA.

## VII

W.Z. last argues that by failing to interpret "likely" to mean "highly likely" or "substantially likely" the judge applied the wrong evidentiary standard to his commitment. W.Z. contends that the "clear and convincing" evidence standard, coupled with the statutory requirement that the individual be "likely" to reoffend, mandates that the risk of reoffense be substantially greater than fifty-percent. The State responds that W.Z. misconstrues remarks made by the court concerning the interpretation of the term "likely" and that at no time did Judge Freedman depart from the clear and convincing evidence standard.

Clearly, in order to commit an individual pursuant to the SVPA, the judge must find the commitment is supported by "clear and convincing evidence." *N.J.S.A.* 30:4-27.32(a). This requirement accords with the holding of the United States Supreme Court in *Addington v. Texas,* 441 *U.S.* 418, 431–32, 99 *S.Ct.* 1804, 1812, 60 *L. Ed.*2d 323, 334–35 (1979), establishing "clear and convincing evidence" as the appropriate standard of proof in civil commitments.

Evidence is "clear and convincing" when it produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

[*In re Commitment of Robert S.,* 263 *N.J.Super.* 307, 312, 622 *A.*2d 1311 (App.Div.1992) quoting, *In re Jobes,* 108 *N.J.* 394, 407–408, 529 A.2d 434 (1987).]

The burden of proof, which denotes a degree of certainty of conviction, is a consideration separate and apart from the likelihood of reoffense, which denotes a factual probability. At no point does W.Z. explain why a court cannot find by clear and convincing evidence that an individual is likely to engage in acts of sexual violence. Facts adduced from expert testimony, psychometric testing, and actuarial instruments may surely create the

firm belief in a judge's mind that a sexually-violent predator is likely to reoffend. W.Z. essentially acknowledges this in a footnote: "While a judge may appropriately take likelihood to mean 'more likely than not,' he or she must still be 'clearly convinced' of that finding."

Judge Freedman clearly applied the proper evidentiary standard in this matter. As a prelude to his decision the judge stated, "Having reviewed the evidence and the testimony of the witnesses at length and several times as well as having reviewed all of the exhibits, I'm satisfied to make the following findings by clear and convincing evidence." The trial colloquies cited by W.Z. entail discussions concerning the meaning of the term "likely," in which the judge analogized a finding of "likely" to a preponderance of the evidence standard. However, the judge never abandoned the requirement that he must be clearly and convincingly persuaded of W.Z.'s likelihood to reoffend before issuing a commitment order.

In support of his argument, W.Z. relies upon the decision of the Supreme Court of Minnesota in *In re Linehan*, 557 *N.W.*2d 171 (Minn.1996), *vacated on other grounds*, 522 *U.S.* 1011, 118 *S.Ct.* 596, 139 *L. Ed.*2d 486 (1997) (*Linehan I*). Like the SVPA, the Minnesota Sexually Dangerous Persons Act (SDP Act), requires a finding by clear and convincing evidence that an individual is "likely" to engage in harmful sexual conduct in the future. *Id.* at 179. The court there rejected the state's argument that the evidentiary standard is not related to the underlying fact to be determined. *Id.* at 180. In so doing the court reasoned:

> First, the best reading of the statute and its concern for accurate factual findings precludes the state's construction. The SDP Act's demand for "likely" harm implies that committing courts cannot combine a factual element that requires only 50.1% probability with an evidentiary standard of less-than-certainty. We do not believe that the legislature intended to *weaken* the standard of likelihood in the SDP Act by combination with a relatively *high* burden of persuasion—the clear and convincing evidence standard. The district court applied this heightened burden of persuasion to each element of proof necessary under the Act, but by demanding *highly* likely future harm, the lower courts established a degree of overall certainty consistent with the statute.

[*Ibid.* (citation omitted).]

This reasoning is somewhat confusing. It is not apparent to us why a heightened burden of proof would weaken the amount of likelihood required by the statute. However, it is clear to us that the Minnesota Supreme Court defines "likely" not as "more likely than not" but as "substantially more likely than not." Further, the court believed that such a definition is more consistent with the clear and convincing evidence standard. The Minnesota court's views on the likelihood standard are further clarified by its subsequent conclusion that substantive due process requires that future harmful conduct must be "highly likely" in order to support a commitment under the SDP Act. *Ibid.* Although the decision was vacated by the United States Supreme Court, on remand the Minnesota Supreme Court continued to require that reoffense be "highly likely." *Linehan II,* 594 *N.W.*2d at 876.

We believe that "likely" in the SVPA could well mean simply a probability of 51% or more. However, we reject the reasoning of the Minnesota Supreme Court in *Linehan I,* in any event. We conclude that the clear and convincing evidence standard can co-exist with but operate independently to ensure that a 51% probability or likelihood is proved to a relatively high-degree of reliability.

Moreover, it is important to note that the SVPA defines the phrase "likely to engage in acts of sexual violence." The Legislature could have defined the term "likely" separately if it so desired, but rather it expressed the intent that "likely" be considered in context. Focusing solely on the term "likely" as W.Z. proposes, probably ignores the clear intent of the Legislature.

In the SVPA, " 'Likely to engage in acts of sexual violence' means the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *N.J.S.A.* 30:4–27.26. From this definition it is clear to us that the question a court must consider is not whether an individual is "likely" to reoffend, but whether an individual poses a threat to the health and safety of others based

upon his propensity to commit acts of sexual violence. "Propensity" is "an innate inclination" or "a tendency." *The American Heritage Dictionary* 1452 (3d ed.1992). *See also Webster's New International Dictionary* 1981 (3d ed.1981) (defining propensity as "a natural inclination: innate or inherent tendency").

In order to determine if a person is "likely to engage in acts of sexual violence" a court must find, by clear and convincing evidence, that the person has a propensity, inclination or tendency, to commit acts of sexual violence and must establish, by clear and convincing evidence, the degree of such a propensity. The court must then weigh the person's degree of propensity against the nature or seriousness of the acts he tends to commit in order to determine the extent he poses a threat to others. For example, given equal degrees of propensity, a sex offender who has a history of criminal sexual contact with adults or exhibitionism would pose less of a threat to the community than an offender with a history of raping children. If both of these hypothetical offenders had a slightly better than even chance (51%) of reoffending, a judge might find that the criminal sexual contact offender does not constitute as serious a threat to the community as the rapist does.

In sum, we conclude the SVPA requires courts to undertake a more complicated, thoughtful analysis of a person's future dangerousness than proposed by W.Z.'s assignment of simple probability to the term "likely." Indeed, if we were to embrace W.Z.'s probability analysis alone and hold that "likely" means "substantially likely," this would obviate the need to consider the SVPA's definition of "likely to engage in acts of sexual violence." The result would be an oversimplification of the analysis a court must undertake and a departure from the Legislature's expressed textual intent in enacting the SVPA.

We uphold the judge's decision to commit W.Z. under the SVPA. On this record, we find there was virtually no disagreement among the experts that W.Z. is highly likely to engage in violent acts in the future and that using sex as a weapon is part of his

regimen. We agree, and it seems clear to us on this record, that W.Z. is highly likely to reoffend in the reasonably foreseeable future.

Affirmed.