772 A.2d 54

IN THE MATTER OF THE COMMITMENT
OF J.P., PETITIONER–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 14, 2001—Decided April 24, 2001.

444

Before Judges KING, COBURN and AXELRAD.

*Luis Negron*, Assistant Deputy Public Defender, argued the cause for appellant J.P. (*Peter A. Garcia*, Acting Public Defender, attorney; *Mr. Negron*, on the brief).

*Nancy Kaplen*, Assistant Attorney General, argued the cause for respondent State of New Jersey (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Mary Beth Wood*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D

I

This is an appeal from a judgment pursuant to the New Jersey Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4–27.24 to–27.38, committing J.P. to the State of New Jersey Special Offend-

ers Unit at the Northern Regional Unit (NRU) in Kearny. Following a commitment hearing at which the judge heard testimony from experts for both sides, the judge found that J.P. posed a threat to the community because he has a mental abnormality which predisposes him to commit acts of sexual violence.

J.P. joins in the appeal brought by *R.S.*, 339 *N.J.Super.* 507, 773 *A.*2d 72 (App.Div.2001) which has been argued with the present appeal, challenging the admissibility of actuarial assessment instruments at sex offender commitment hearings. J.P. also raises several constitutional challenges to the SVPA identical to those raised in the appeal brought by *W.Z.*, 339 *N.J.Super.* 549, 773 *A.*2d 97 (App.Div.2001) which has also been argued with the present appeal.

The unique issues raised by J.P. on this appeal concern the admissibility of actuarial assessment instruments against sex offenders whose offenses were committed while under age eighteen and the sufficiency of the evidence to support the trial judge's judgment of commitment in his particular case. J.P.'s arguments concerning these issues have some merit since the question of the admissibility of actuarial assessment instruments against juvenile sex offenders was not considered with any particularity by the trial judge and the State's experts offered little evidence aside from an institutional record review. Thus, we remand this matter for an evidentiary hearing concerning the admissibility of the actuarial assessments of J.P. The parties may supplement the actuarial and clinical testimony to the extent desired, subject to any limitations imposed by the judge. The judge may then decide the matter anew and, of course, the disappointed party may appeal.

II

On April 20, 2000 the Attorney General filed a petition for the civil commitment of J.P. under the SVPA. He had served the maximum on his custodial sentence by April 25, 2000. The

petition was accompanied by two clinical certificates of involuntary commitment prepared by Neal Brandoff, D.O., and John J. Wilkins, D.O., certifying that J.P. is a violent sexual offender who suffers from a mental abnormality or personality disorder which makes him likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment. On April 25, 2000 J.P. was temporarily committed to the NRU until a final hearing could be conducted on the issue of the continuing need for his involuntary commitment as a sexually violent predator.

A commitment hearing was held before Judge Perretti on September 28, 2000. Following testimony by two expert witnesses for the State and one expert for J.P., the judge found that J.P. qualified as a violent sexual predator. The judge entered an order on September 28, 2000 committing J.P. to the NRU and scheduling a review hearing for May 28, 2001.

### III

In 1983, J.P., born on August 26, 1967, was sentenced to a term of thirty years in prison with fifteen years minimum parole ineligibility for the aggravated sexual assault of two women and the attempted aggravated sexual assault of a third. The offenses occurred when J.P. was fourteen and fifteen years of age; the judge determined that the nature of the offenses and J.P.'s extensive juvenile record warranted prosecution and sentencing as an adult. At the time of the aggravated sexual assaults, J.P. had a record of juvenile adjudications dating back to 1980 for such offenses as shoplifting, receiving stolen property, burglary, theft, robbery and criminal sexual contact. While incarcerated as a juvenile he had at least thirteen institutional charges.

J.P.'s three sexual assaults were committed in 1982 and involved very similar circumstances. In each case, J.P. grabbed a young woman around the neck from behind, threatened to kill her with a knife, dragged her to a secluded area, and took her money. In the first offense, J.P. removed the victim's clothes but she was able to

escape before he performed sexual intercourse. In the other two offenses, J.P. forcibly raped the victims.

Prior to sentencing, J.P. was evaluated at the Adult Diagnostic and Treatment Center in Avenel for possible sentencing as a sex offender under the *N.J.S.A.* 2C:47–3. The staff psychologist who examined J.P. noted that he was a fifteen-year-old with a history of marijuana use and school suspensions. The psychologist concluded that J.P.'s "sexual offenses are only one part of an antisocial personality structure in an individual with limited knowledge.... There was no elicitation of a compulsive type of psychosexual pathology and, thus, the individual would not qualify under the purview of the New Jersey Sex Offender Act."

J.P. remained in state prison from 1983 until he completed his sentence on April 25, 2000 and was ready for release. He was not offered sex offender therapy, but he did complete a program for alcohol abuse and earned a GED certificate. J.P. received twelve institutional charges while incarcerated, including charges for fighting, attempting to commit an infraction, possessing and introducing narcotics paraphernalia, lying to staff and refusing to obey. The narcotics paraphernalia charge was brought in 1991. The record is silent as to when the other charges occurred.

In 1998, J.P. was evaluated by a Department of Corrections psychologist who concluded that he was "psychologically appropriate" for gang minimum security, full minimum security, community release or parole. The psychologist commented that J.P. did not present with any major thought disorders and did not appear to be an assault or escape risk.

On April 18, 2000 Dr. Brandoff prepared a clinical certification in which he reviewed J.P.'s criminal history, psychiatric history and the circumstances surrounding the 1982 aggravated sexual assaults. Brandoff diagnosed J.P. as suffering from alcohol and marijuana abuse and an antisocial personality disorder. A score of +18 on the MnSOST–R risk assessment tool was reported along with a rating of "high risk." Brandoff concluded that J.P.

suffers from a mental abnormality or personality disorder that makes him likely to engage in acts of sexual violence in the future.

On April 19, 2000 Dr. Wilkins prepared a clinical certification in which he diagnosed J.P. as suffering from an antisocial personality disorder. Wilkins' certification is much less detailed than that of Brandoff, with many paragraphs not completed or simply designated "N/A." Under "findings of psychological testing or risk assessment tools," Wilkins lists Brandoff's report of +18 on the MnSOST–R.

Prior to J.P.'s commitment hearing, reports were prepared by Dr. Stanley R. Kern, a psychiatrist employed by the NRU; Dr. Merrill Berger, a psychologist employed by the Division of Mental Health Services; and Dr. Paul F. Fulford, a psychologist retained on behalf of J.P. All parties stipulated to the qualifications of these experts.

Kern testified that he prepared his report on September 18, 2000 based solely on J.P.'s history without conducting a clinical interview. This was due to a miscommunication with the guards and not to any fault of J.P. Kern diagnosed J.P. as suffering from alcohol abuse, cannabis abuse and an antisocial personality disorder. J.P. has no mental deficiency or psychotic process, but his emotional and volitional functions are impaired as a result of his personality disorder. In Kern's opinion, J.P. is a violent sexual predator who needs to be confined for custody, care and treatment at the NRU.

Kern explained that he conducted a clinical interview of J.P. on September 25, 2000 and that the interview did not change his opinions on J.P.'s diagnosis and classification. He never asked J.P. why he had committed the crimes or whether he felt any remorse. On several occasions while testifying, Kern seemed unfamiliar with J.P.'s criminal and custodial history. He concluded his testimony by stating that all individuals with antisocial personality disorders should be incarcerated.

A "Comprehensive Achival [sic] Review and Summary of Psychological Testing" was prepared for J.P. by Dr. Berger on September 23, 2000. Berger testified that her report was based upon a review of J.P.'s records and a review of psychometric testing performed by others. Berger conducted a clinical interview of J.P. on September 27, 2000 but did not testify concerning that assessment because no report had been provided to J.P.'s attorney. She did state that the interview had not changed the opinions given in her original report.

In her report, Berger wrote that J.P. was a regular and attentive participant in process groups at the NRU, but that "[i]t is clear from the progress notes that [J.P.] has considerable work to do in the areas of gaining a complete understanding of his sex offense cycle and his feelings of anger toward women." While J.P. "has avoided serious interpersonal conflict on the housing unit, there is evidence that he has aligned himself with some severely antisocially oriented residents.... Association with criminally oriented peers is a well documented risk factor for both violent and sexual acting out."

The report summarizes the results of various psychological tests used to evaluate J.P. The Millon Clinical Multiaxial Inventory–III (MCMI–III), a test that measures personality traits, revealed prominent histrionic and obsessive compulsive tendencies. The Multiphasic Sex Inventory–II (MSI–II), which measures a variety of sexual thoughts and behaviors, indicated that J.P. has a tendency toward denial and minimization. J.P.'s "responses reflect a moderate level of commonality in both thinking and behavior with a nationally stratified sample of both rapists and child molesters." Two tests, the Bumby Cognitive Distortion Scales and the Abel & Becker Sexual Interest Card Sort, revealed "naive attempts at impression management." Finally, the Child Empathy Test and Empathy for Women Test indicated that J.P. has empathy deficits that are consistent with his MSI–II results. The report does not indicate when, where, or by whom any of these tests were administered.

The report also sets forth the results of two actuarial risk assessment tools that were scored for J.P. The first, the Static 99, is described as follows:

> The Static 99 was designed to predict long-range risk for sexual recidivism by combining two well standardized risk assessment scales, the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), and the Structured Anchored Clinical Judgment (SACJ). Research has shown (Hanson & Thornton, 1999) that by combining the factors tapped by these two scales that predictive power is increased. [J.P.'s] score of 7 places him in the high risk range for future sexual offending.

The second assessment instrument is summarized as follows:

> The Minnesota Sex Offender Screening Tool–Revised (MnSOST–R) is another actuarially derived and rigorously validated risk assessment instrument developed to aid clinicians and criminal justice officials in assessing risk for future sexual dangerousness in convicted sex offenders. [J.P.'s] score of 17 places him in the high risk category for risk of future sexual violence.

The assessment tools are based upon static factors, which are elements of a person's history which cannot be changed, as opposed to dynamic factors, which are elements which can be modified over time. Berger wrote that "[t]here is considerable research support for risk assessment instruments based on static factors. However, there is far less support for risk predictions based on dynamic factors, as they are often much hard [sic] to measure and by their very nature change over time."

Berger concluded that J.P. "possesses numerous static and dynamic factors that place him at extremely high risk for future sexual violence. . . . Without extensive sex offense specific treatment in a secure setting, [J.P.] will continue to pose a risk for future sexual violence."

After identifying and endorsing her report, Berger's testimony at the hearing focused solely on the scoring of the actuarial instruments. Specifically, Berger explained that she used her clinical judgment in scoring J.P. as having a history of "part-time, seasonal or unstable employment" even though he was only fifteen and a full-time student at the time of his incarceration. Similarly, she used her clinical judgment in scoring J.P. as having had no treatment for chemical dependency even though he had completed

all of the A.A. treatment that was offered to him while in prison. Finally, Berger admitted that she had scored the Static 99 incorrectly, by double counting J.P.'s first criminal sexual contact offense, but noted that the revised score still placed him in the high risk category.

Following Berger's testimony, counsel for J.P. objected to the evidentiary reliability of the Static 99 and the MnSOST–R. Judge Perretti responded by adopting, by reference, the earlier opinion of Judge Freedman in which he found actuarial instruments admissible as clinical tools in SVPA commitment hearings. Judge Perretti said:

> Judge Freedman in his lengthy opinion found them admissible as tools. They are tools, which are used by clinicians in this area of their expertise. There is nothing that I have ever said nor have I seen anything said by any legal writer that these are anything more than what they purport to be: Actuarial, placing people in groups, matters for consideration by clinicians, not binding. I mean, it's not like an X ray, and I don't think anybody ever said it was. I think it's admissible for what it is. And I'll cast my vote with Judge Freedman on that.

> \*   \*   \*   \*   \*   \*   \*   \*

> And I'm not going to repeat this exhaustive multi-page—I think he's got 60 pages or more in which he exhaustively goes into the background of these various tests. And I believe that these two are included. Okay.

Dr. Fulford testified on behalf of J.P. based upon a report he prepared on September 11, 2000 and an addendum prepared on September 22, 2000. Fulford diagnosed J.P. as suffering from alcohol abuse in remission and substance abuse in remission. J.P. had volitional, cognitive and emotional control. Based upon a clinical interview with J.P., Fulford concluded that J.P. was a different person now than he was at age fifteen and that he has retrospective insight into his antisocial behaviors.

Fulford said in his report that

> [i]t is important to note that [J.P.'s] offenses occurred as a juvenile, both for his sexual offenses and for his marijuana and alcohol abuse. According to the DSM IV, an anti-social personality is "a pervasive pattern of disregard for, and violation of the rights of others that begins in childhood or early adolescence, and continues into adulthood." The key factor here is that [J.P.'s] behaviors of an anti-social nature were not continuing into adulthood, and, as such, there is not the justification to give him a diagnosis of anti-social personality disorder.

Fulford stood by this assertion at the hearing, stating that J.P.'s history of institutional infractions could not be used to support a diagnosis of antisocial personality disorder because, due to the nature of the institution itself, seventy percent of all inmates have a significant record of infractions. Fulford's ultimate recommendation was that J.P. be released to community supervision, receive outpatient treatment in a mental health center for the rest of his life, and receive additional A.A. and N.A. treatment.

Large portions of Fulford's testimony and of his report were devoted to discussing the scoring of J.P.'s actuarial assessments. Fulford was familiar with the actuarial instruments used to assess the risk of recidivism in sex offenders and he stated that the MnSOST–R and the Static 99 are the two most promising. Although he observed that additional studies needed to be conducted on the instruments, he agreed that they are important tools to guide clinical judgment. In Fulford's opinion, the high score J.P. received on the MnSOST–R was not valid because J.P. exhibited a pattern of adolescent behaviors and impulsiveness at the time of his offenses that are no longer exhibited in his adulthood. Fulford concluded that "it appears that assessing his overall risk, he would more likely be in the moderate, rather than high range of risk, and that the anti-social and impulsive behaviors, with limited behavioral controls, refer to those behaviors of an adolescent."

In summation, counsel for J.P. argued that the State had not established by clear and convincing evidence that J.P. has a mental abnormality which predisposes him to commit sexual acts of violence. Counsel complained that both certifying experts made their initial recommendations to commit J.P. without a clinical interview, and that the procedures followed by the State were "shoddy" throughout the proceedings.

The State responded that all of the assessment tools indicated that J.P. is at high risk to reoffend

[a]nd you know that 16 years in prison with—in the words of Dr. Fulford, inadequate—inadequate treatment for the problems that he had, nothing's changed. He grew up. He grew up in prison. . . . Even when pressed on cross-

examination Dr. Fulford indicated that, yes, 16 years in prison, that's going to leave you with some emotional effects, some emotional problems at the very least.

The State urged that although J.P. does not suffer from a sexual compulsion, his history shows that "he's dangerous, and nothing has been done to change that dangerousness."

In rendering her decision, the judge reviewed J.P.'s lengthy criminal and juvenile history and concluded that he met the first criteria of the statute in that he had been convicted of a violent sexual offense. The judge summarized the expert testimony and concluded that J.P. suffers from alcohol and cannabis abuse and has an antisocial personality disorder that affects his volitional capacity in a manner that predisposes him to acts of sexual violence. The judge addressed the actuarial tools, finding that Fulford's challenges to the scoring were not convincing. The judge then stated that "I find that these tools and the testimony of Dr. Berger assist me in finding that there is a very high risk, a very real and present risk, and the public needs protection." Finally, the judge concluded:

This has been called by someone here a tragedy. And the terrible tragedy is that this person, [J.P.], who now an adult man, is confined here in this institution; has been confined ever since he was a young adolescent, and that somehow the State of New Jersey totally failed him as a youth. There just doesn't seem any record here [of] any great interest in him or any help. His truancy and his misbehavior in school just resulted in him being put in one of those classes where you put disorderly kids.

## IV

J.P. challenges the admission of actuarial risk assessment instruments at his SVPA commitment hearing and joins in the merits brief filed on behalf of R.S. in *In re the Commitment of R.S.*, 339 *N.J.Super.* 507, 773 *A.*2d 72 (App.Div.2001) argued on the same calendar. The issue of general admissibility of the instruments raised by J.P. is identical to that raised by R.S. Analysis of the admissibility of actuarial instruments in general is contained in V, VI, and VII of the *R.S.* opinion. 339 *N.J.Super.* at 530–549, 773 *A.*2d at 85–97. As the discussion and conclusion

there are equally applicable to the challenge brought by J.P., they are incorporated into this opinion.

The facts of J.P.'s case, however, raise additional and novel issues concerning the admissibility of actuarial instruments. All of J.P.'s offenses were committed while he was a young adolescent—his last of three aggravated sexual assaults was committed when he was age fifteen. Although neither party specifically articulates this as an issue, we have some doubt whether actuarial tools can be used to evaluate a sex offender's risk of recidivism under such circumstances.

In his testimony at the evidentiary hearing, Dr. Dennis Doren, the State's expert witness, responded to questioning about the limitations of the actuarial instruments as follows:

[I]n terms of the limitations, the—all of the instruments that we're talking about are limited in terms of that none of them have been tested using any female sex offenders. They've all been tested with male sex offenders.

And all of those instruments have been tested with male sex offenders who are at least 18-years-old at the time of the data gathering about them, in other words, adults. So, the application to juvenile sex offenders, people who are still juveniles I should say, is also more questionable or at least more difficult to use this in—I would just say more questionable.

Doren further stated that "[i]f I were trying to apply the instrument to a juvenile, someone younger than 18 in New Jersey, I would have significant concern."

At the hearing, Fulford, J.P.'s expert, reflected the same concern when testifying that J.P.'s actuarial scores are not valid because at the time the offenses were committed, J.P. exhibited adolescent behaviors that did not continue into adulthood. Fulford believed that J.P. is a different person now from what he was at age fifteen.

The reliability of actuarial instruments to predict the future dangerousness of sex offenders whose offenses were committed only while juveniles is addressed nowhere else in the transcripts of the *J.P.* or *R.S.* proceedings. Given the testimony of the State's own expert, the applicability of these instruments to J.P. is questionable. Doren said that the instruments were developed

using male sex offenders over age eighteen, but he did not say whether any data was collected for offenders who had been continuously incarcerated since they were young adolescents. His statement that the offenders were all adults at the time of the data collection is ambiguous. This likely refers to the time the crimes were committed.

Doren's statements could, of course, be interpreted as expressing concern only when the individual whose risk is being assessed is still a juvenile. On the actuarial assessments, sex offenses committed while a juvenile can be taken into account in scoring the instruments of adult offenders. However, when an individual's last sex offense was committed while he was age fifteen, and he has been incarcerated since, the static nature of the instruments effectively freezes that person in his adolescence, making no allowance for the process of maturity. The instrument tends to assess a juvenile only because there is no information about how that person will behave as an adult in society. The value of comparing such a person to other adults who were studied in developing the actuarial instruments is questionable.

The content of the actuarial instruments themselves illustrates the difficulty in applying them to individuals such as J.P. At the commitment hearing, Fulford disputed the scoring of the MnSOST–R with regard to employment history since J.P. was only fifteen at the time of his incarceration. An examination of the MnSOST–R score recording sheet shows that Question Twelve, employment history, has no response that would be applicable to an offender incarcerated since early adolescence. Similarly, Question Eight, offenses against thirteen-to-fifteen-year-old victim, is inapplicable in this situation since it conditions a response on the offender being five years older than the victim. This question could not provide any relevant information, whether favorable or not, about J.P. Another example is found in the coding rules for the Static 99, which specifically state that "[i]t is not recommended for adolescents (less than 18 years)." Further, one of the questions on the Static 99 score sheet inquires whether

the offender has ever lived with a lover for at least two years. This information is of no value when applied to a fifteen-year-old. Thus the instruments themselves cast doubt on whether they are reliable predictors of future dangerousness when applied to a sex offender incarcerated since early adolescence.

Given Fulford's opinion that the instruments are invalid in J.P.'s case and the problems apparent from the instruments themselves, the State might have attempted to present some evidence, if available, that actuarials could be properly admissible against subjects whose offenses were committed while under age eighteen. The State presented no evidence at all in this regard. We doubt that such information is currently available. The only testimony concerning the application of the instruments to juveniles elicited from the State's expert at the *R.S.* evidentiary hearing calls their reliability into question.

For these reasons, we find that the judge erred in admitting testimony concerning the Static 99 and the MnSOST–R at J.P.'s commitment hearing on this record. Because the testimony concerning the reliability of J.P.'s actuarial scores was ambiguous and incomplete, the matter is remanded for an evidentiary hearing concerning the admissibility of actuarial instruments under the circumstances presented in this case. Of course, each side may supplement the prior proofs. If, after an evidentiary hearing, the judge rejects the actuarial proofs, her decision must be made on the clinical data alone.

V

J.P. next claims that his commitment violates substantive due process because the State must show that he lacks total volitional control of his sexual impulses before he can be involuntarily committed pursuant to the SVPA. This claim raised by J.P. is identical to that presented by W.Z. in *In re the Commitment of W.Z.*, —— N.J.Super. ——, —— A.2d ——, 2001 WL 410294 (App.Div.2001) (A–6256–99T3), which has been jointly argued with this appeal. Analysis of this issue is contained in the *W.Z.* opinion

at V. That discussion is equally applicable to the challenge brought by J.P., and is incorporated into this opinion.

## VI

J.P. next contends that the SVPA's failure to completely mirror the language of the general commitment statute, *N.J.S.A.* 30:4–27.1 to –27.33, renders it void under state constitutional requirements. J.P. also contends that the language of the SVPA is unconstitutionally vague. The arguments raised by J.P. are identical to those presented by W.Z. in *In re the Commitment of W.Z.*, 339 *N.J.Super.* 549, 773 *A.*2d 97 (App.Div.2001). Analysis of these issues is contained in V of the opinion in *W.Z.* As that discussion is equally applicable to the challenge brought by J.P., we incorporate it by reference in this opinion.

## VII

J.P. next argues that the State did not establish by clear and convincing evidence that he is likely to commit acts of sexual violence in the foreseeable future. Specifically, J.P. challenges the accuracy of Kern's diagnosis and cites the favorable diagnosis rendered by his expert, Fulford. J.P. also raises issues concerning the clear and convincing evidence requirement and its effect on the SVPA's "likelihood" standard. The issue raised by J.P. regarding burden of proof and the meaning of the term "likely" is identical to that raised in *In re the Commitment of W.Z.*, 339 *N.J.Super.* 549, 773 *A.*2d 97 (App.Div.2001). This issue is analyzed in VII of the *W.Z.* opinion. That discussion is incorporated into this opinion.

The State responds that the testimony of Kern and Berger amply supports a finding that J.P. is a sexually violent predator in need of confinement for care and treatment. The State particularly points out that of special concern is J.P.'s choice of companions at the NRU, since association with criminally-oriented peers is a risk factor for future "acting out."

■ The scope of appellate review of a trial court's decision in a commitment proceeding is extremely narrow. *State v. Fields,* 77 *N.J.* 282, 311, 390 *A.*2d 574 (1978). The reviewing judge's determination should be accorded "utmost deference" and modified only where the record reveals a clear abuse of discretion. *Ibid.* Judge Perretti based her decision to commit J.P. on the results of the actuarial assessments and the testimony of Berger. The actuarial instruments on the present state of the record, however, cannot be used to support this decision, as discussed in IV. On the remand the State may seek to enhance the proofs on actuarial assessment and clinical opinions, as may J.P.

At the *R.S.* evidentiary hearing, Dr. Glenn Ferguson testified on behalf of the State that the NRU follows the adjusted actuarial approach to evaluating sex offenders.

[W]e take some standardized risk assessment scales for sexual recidivism and also include other psychological instruments, standardized personality inventories as well as clinical interviews and clinical observations of individuals that we're assessing, and combine them to achieve what we call convergent validity.... [T]he purpose of the adjusted actuarial method is so we're basically getting, you know, the chance to use the strengths of the different instruments as well as minimize their weaknesses by using other instruments so that we're, you know, coming up with a consensus or an agreement across several measures.

There is no evidence that the adjusted actuarial method was used to evaluate J.P. Kern arrived at his initial diagnosis and his recommendation to commit based solely on a review of J.P.'s records. Although Kern interviewed J.P. three days before the hearing, he did not testify concerning any clinical findings or clinical observations made at that interview. In fact, throughout his testimony Kern seemed somewhat unfamiliar with J.P.

Further, although J.P.'s history of institutional infractions was considered to be crucial by Kern in supporting his diagnosis of antisocial personality disorder, there was no evidence presented concerning when these infractions occurred, with the exception of the charge for possession of drug paraphernalia in 1991. Whether the infractions occurred evenly over the course of J.P.'s eighteen-year incarceration or whether they were concentrated at the beginning of his term might be relevant to J.P.'s risk assessment.

Like Kern, Berger also based her report and recommendation solely on a record review. Berger conducted an interview with J.P. on the day before his hearing, but she was not allowed to address any clinical findings in her testimony because no report had been provided to J.P.'s counsel. Although Berger reviewed the results of numerous psychological tests contained in J.P.'s record, it is not clear when or by whom the tests were administered.

*In re Commitment of J.B.*, 295 *N.J.Super.* 75, 78, 684 *A.*2d 925 (App.Div.1996), the court reversed two judgments of commitment that were based on a psychiatrist's review of screening documents. Noting that the screening documents were never available for cross-examination and never put into evidence, the court wrote:

In both cases [the psychiatrist] relied on statements of conduct without any knowledge of the source nor any knowledge as to when the alleged conduct took place. He testified in both matters that he had made no effort to make inquiry of the screener but relied exclusively on the written report. It was impossible for the trial judge to consider the trustworthiness of "the sources of information or the method, purpose or circumstances of preparation."

[*Id.* at 78–79, 684 *A.*2d 925.]

■ While a commitment under the SVPA differs from a commitment under the general mental health statutes, clearly the Legislature intended that an SVPA commitment hearing include testimony from a mental health professional who has personally interviewed the person subject to commitment. *N.J.S.A.* 30:4–27.30(b) provides:

A psychiatrist on the person's treatment team who has conducted a personal examination of the person as close to the court hearing date as possible, but in no event more than five calendar days prior to the court hearing, shall testify at the hearing to the clinical basis for the need for involuntary commitment as a sexually violent predator.

Although both Kern and Berger did personally examine J.P. prior to the hearing, they did not discuss the interviews or offer any first-hand clinical judgments derived from them. They prepared a clinical diagnosis and they interviewed J.P., but there was no integration of the two. While this procedure might technically conform to the requirements of *N.J.S.A.* 30:4–27.30(b), it is not

consistent with the spirit of the statute. Instead of testimony concerning the clinical basis for commitment drawn from a personal examination of the patient, all of the testimony at J.P.'s hearing was based upon the sort of record review found deficient in *J.B.*, 295 *N.J.Super.* at 78, 684 *A.*2d 925.

◼ Finally, three principal arguments relied upon by the State in support of J.P.'s commitment are troubling. The State has argued that J.P. presents a risk of engaging in sexually violent acts in the future because he is emotionally scarred from growing up in prison; he has had no treatment for his dangerousness; and he associates with "criminally oriented peers." These arguments point to factors over which J.P. has had little or no control and which were in essence predestined at the time of his sentencing in 1983. Thus, weighing these factors against J.P. might, for all practical purposes, amount simply to an indefinite extension of his original sentence. Such a result could be an impermissible application of the SVPA, which must be nonpunitive and which must focus instead on protecting the public and providing treatment to sexually violent predators. *Seling v. Young,* 531 *U.S.* 250, ——, 121 *S.Ct.* 727, 734, 148 *L.Ed.*2d 734, 745–46 (2001).

◼ Because the judge's determination to commit J.P. was based upon actuarial instruments which were not admissible as to an adolescent or juvenile offender on this record and not reliable in the form presented and upon expert testimony that consisted of little more than an institutional record review, we conclude it is not supported by clear and convincing evidence in the record.

We remand for a new hearing consistent with our expressions in this opinion.

Remanded.