**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1944-23

DAVID COLLINS,

    Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

    Respondent.

_____

Argued October 28, 2025 – Decided December 29, 2025

Before Judges Sumners and Augostini.

On appeal from the New Jersey State Parole Board.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Scott M. Welfel, of counsel and on the briefs).

Leo R. Boerstoel, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Azeem M. Chaudry, Deputy Attorney General, and Leo R. Boerstoel, on the briefs).

PER CURIAM

David Collins appeals the New Jersey State Parole Board's December 13, 2023 final agency decision denying him parole and imposing a sixty-month Future Eligibility Term (FET). The Board found that, despite Collins' four decades of incarceration—which included extensive disciplinary infractions— he presented "minimal insight into [his] criminal thinking" that required additional programming. The Board also found "that a preponderance of evidence indicates that there is a substantial likelihood that [he] would commit a crime if released on parole at this time."

We reverse and remand for the Board to reconsider its decision at a new hearing within 90 days. The record demonstrates that the Board lacked a sufficient basis to find that Collins posed a substantial likelihood of re-offense— he has completed extensive rehabilitative programming while in prison, was assessed as a "moderate" risk of re-offense, expressed remorse for the offense throughout his parole hearing, and has not incurred any disciplinary infractions since 2009.

A-1944-23

## I.

On April 11, 1983, Collins beat A.B.,[1] his former girlfriend D.B.'s mother with a bat, stabbed her with a knife, sexually assaulted her, and submerged her head in water. A.B. died from blunt trauma to the head. He then took $200 from her purse. Before the incident, Collins lived with A.B. and D.B., the mother of his infant son, until he was told to leave after stealing A.B.'s car. Collins stated he committed the crime after learning his girlfriend and her mother were moving away.

A month later, Collins pled guilty to first-degree murder, first-degree robbery, second-degree burglary, first-degree aggravated sexual assault, possession of a weapon for an unlawful purpose, and hindering apprehension. In accordance with his plea agreement, he was sentenced to an aggregate life term with an additional twenty-year term and forty-year parole disqualifier.

During his incarceration, Collins incurred nineteen disciplinary charges including four asterisk (serious) charges and fifteen non-asterisk charges. The serious infractions included possession of prohibited substances in 1992, 1984, and 1998, attempting to commit or aiding another person to commit a prohibited

---

[1]  The Parole Board's decision refers to the victim and her daughter by their initials. We do likewise.

A-1944-23

institutional infraction on July 8, 1992, and bribing an official or staff member on October 27, 1989. His last disciplinary offense occurred in 2009.

Collins completed twenty-one programs in prison, including six for therapy, two for substance abuse, and various vocational and religious classes, and earned his GED. At the time of his parole proceedings, he was participating in eleven programs, including vocational training and educational classes and was earning credits for an associate's degree.

Prior to Collins' initial parole board hearing on January 25, 2023,[2] he was evaluated twice by Nakia Perry-Goffney, Psy.D. After the first evaluation, Dr. Perry-Goffney concluded the sixty-year-old Collins did not have severe psychological problems, had a moderate risk for future violence, and that his chances of successfully completing parole were "good" given his family support,

---

[2] At the court's request, the parties submitted supplemental briefs addressing to what extent Krug v. N.J. State Parole Board, 261 N.J. 477 (2025) affects this appeal. Krug addressed whether retroactive application of the 1997 Parole Act amendment's new information clause to an incarcerated person who committed a crime prior to 1997 violated the ex post facto clause. 261 N.J. at 480. The new information clause allowed parole boards to consider all information, including the facts of the offense and criminal history, at an incarcerated person's second or subsequent parole hearing. Id. at 490. Because this appeal concerns Collins' first appeal, Krug is inapplicable. See L. 1979, c. 441, § (12)(c) ("An inmate shall be released on parole on the new parole eligibility date unless new information filed" indicates that the incarcerated person is substantially likely to commit a crime if released) (emphasis added).

educational progress, and work experience while in prison. The doctor gave Collins a score of "12" for his Level of Service Inventory-Revised (LSI-R), which "indicates a low risk for recidivism with a 20% chance of re-arrest and a 13.3% chance of reconviction within two years of release." In terms of his motivation for the offense, she observed that Collins thought he was "being deprived of his relationship with [D.B.]" and saw A.B.'s mother "as challenging his masculinity."

Regarding Collins' risk factors, Dr. Perry-Goffney noted that despite his "antisocial traits" and lack of "a prosocial peer support network," his older age is typically correlated with "decreased impulsivity, reactivity and likely lessened criminality." Thus, she recommended that he be placed in a halfway house to "demonstrate prosocial responsible behavior" before being released to the community. If released on parole, she recommended that Collins abide by a curfew, avoid "certain people and places as identified by the parole department," participate in mandatory drug testing, perform part-time educational or vocational work, and receive supportive counseling services.

Dr. Perry-Goffney also conducted a Millon Clinical Multiaxial Inventory-III, "a test that measures personality traits, reveal[s] prominent histrionic and obsessive compulsive tendencies." In re J.P., 339 N.J. Super. 443, 450 (App.

Div. 2001). She noted that Collins had a "marked distrust of others," was "[willing] to be demeaned and placed in an inferior light," and displayed "pessimistic" and "self-denigrating" ways of thinking.

At Collins' second evaluation, Dr. Perry-Goffney conducted the STATIC-99R, "an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014). She scored him "+2," predicting a "recidivism rate [of] 4.6% over 5 years, with a 95% confidence interval between 4% and 5.2%," which is within the "[a]verage risk category" for a sample population of sex offenders. Accordingly, she concluded Collins did not meet the definition of a "sexually violent predator" and did not require treatment before his release to the community.

Dr. Perry-Goffney also inquired about Collins' three disciplinary infractions for indecent exposure while in prison. Collins described that he "was not attempting to be an exhibitionist" and denied any "deviant sexual interests, behaviors, or fantasies . . . [or] pedophilic or coercive sexual interests." Dr. Perry-Goffney found his denial to be "genuine" and noted that he likely exhibited "some level of carelessness, if not exhibitionist tendencies."

A-1944-23

The hearing officer considered Collins' disciplinary and program history and Dr. Perry-Goffney's psychological evaluation. He also considered Collins' statement that if he was released on parole he planned to work as a personal trainer and live with his brother in Lindenwold. The hearing officer recognized that Collins received a "favorable institutional adjustment at South Woods" and "scored a low-risk assessment evaluation."

In assessing Collins' eligibility for parole release, the hearing officer weighed mitigating and aggravating factors. As to mitigating factors, he noted that Collins lacked a prior offense record, participated in behavioral and institutional programs, the institutional programs reflected favorable adjustment, he attempted to enroll and participate in programs but was not admitted, and his risk assessment evaluation. As to aggravating factors, he cited the facts and circumstances of Collins' offense, commission of multiple offenses, and numerous and serious institutional infractions. The hearing officer referred Collins for a Board panel hearing.

A two-member Board panel conducted Collins' parole hearing. Collins explained his motivations in committing the crimes, his prison disciplinary infractions, his family support if paroled, and reasons why he should be paroled. He stated his crimes were committed due to a combination of factors: he was

7

angry because A.B. used to "beat" D.B.; A.B. did not approve of his relationship with D.B. because he had stolen A.B.'s car; he acted out of "foolishness" and "irresponsibleness"; "[he] was trying to be somebody [he] wasn't . . . [and was] trying to take control of the situation"; and he feared losing his son because D.B. and A.B. were moving away.

Specific to the sexual assault, Collins explained, "[his] young immature mind . . . [and] the way [A.B.] used to present herself around the house" informed his mindset at the time and noted that "[he] acted out . . . [and] didn't have any control over [himself]." He also noted "[A.B.] had a nice figure, so I guess I was attracted to her and that's why I did what I did." Finally, when asked to identify the victims of his crimes, he only stated A.B., but then apologized, stating: "[D.B.] is a victim. The family members are a victim. Everybody is a victim." Regarding his family support, Collins remarked that he and his forty-year-old son, a pastor, have been in contact since 2015.

Collins stated he is a changed person now, reflecting:

> I am appalled at the person that I used to be, that I even could be that person to do something like that. So like I said, all I can do right now is try to help as many people as I can. I know it only starts with one, but if I can just tell my story and change one person's life then that's what I'm gonna do.

A-1944-23

In terms of his disciplinary infractions, Collins denied the substance of the indecent exposure offenses, stating that he "didn't expose [himself] to anyone." Finally, when asked why he should be paroled, Collins, among other things, said: "I deserved everything that I got . . . [e]verything that happened to me all this time, I mean there is nothing that I can do to undo what I did."

The panel denied parole, reiterating the mitigating and aggravating factors listed in Collins' case assessment. The panel reasoned:

> Mr. Collins committed a heinous crime and was upfront about what he did during the hearing. He did not articulate an understanding of why he did what he did, only saying that's not him anymore. He had 3 charges for indecent exposure which he minimized saying the charge was a misconception by the officer.

The panel "determined a substantial likelihood exists that [Collins] would commit a new crime if released on parole."

Four months later, the panel issued an amended decision to "clarify the factors that were in the record at the time [Collins'] case was assessed and that were relied upon by the Board Members in rendering the decision to deny [his] parole."[3]

---

[3] The two-member panel's amended decision was in response to the Division of Release amending Collins' case assessment after Collins' initial hearing on January 25, 2023. The changes involved removing fifteen years from the total

The three-member Board panel convened and established a sixty-month FET for Collins. In its reasoning for applying a FET outside of the administrative guidelines, the panel relied on the facts and circumstances of Collins' offense, Collins' institutional infractions (emphasizing the four serious infractions), and his insufficient problem resolution. The panel also noted that it considered Collins' mitigation letter in establishing the FET.

In terms of problem resolution, the panel noted that Collins "possessed only marginal insight into the criminal thinking related to the murder" and that his actions were indicative of "an individual with no conscience." The panel found that Collins' reasons for the offense—that he killed A.B. to remain with D.B. and his child—did not make sense since "[b]y killing [A.B.], [he] would more than likely be arrested and go to prison." Additionally, it noted that Collins characterized the murder as "retribution" for witnessing the mother physically assault D.B., but that this explanation did not capture "the full scope of [his] negative attitude and emotions towards the victim." Notably, the panel

sentence term, reinstating all of Collins' offenses (except for murder) as active, changing Collins' non-asterisk charges from twelve to fifteen, and adding three disciplinary infractions (being in an unauthorized area, confiscated material, and engaging in sexual acts with others). The two-member panel noted that the amended case assessment would be provided to the three-member panel in determining the FET.

expressed concerns about the sexual assault component of the crime, noting that Collins initially failed to provide a reason for his actions but then later stated that the victim had a "nice figure." These statements, when coupled with Collins minimizing his indecent exposure infractions, informed the panel's concerns about Collins' lack of insight into his actions.

The panel also relied on Collins' disciplinary infractions in establishing a sixty-month FET. It noted that Collins had incurred nineteen infractions that included four "serious" offenses and numerous indecent exposure incidents that Collins denied. Thus, the panel concluded that Collins' disciplinary record demonstrated his "propensity to commit indecent exposure infractions . . . [and] that [he] knowingly . . . violated the rules and . . . acted out for self-serving reasons."

Finally, the panel acknowledged Collins' progress in programming but reasoned that he "must immerse [himself] in further programming" to address his lack of insight into the crime he committed. Specifically, the panel reasoned that "multiple issues" existed between Collins and A.B. beyond just witnessing her physically assault D.B., and that he "must do a self-analysis [of] how all of

those issues in total impelled [him] to commit the murder."  Accordingly, the panel established a sixty-month FET.[4]

Collins appealed to the full Board, stating the panel "failed to consider material facts"; "failed to document that a preponderance of the evidence indicates a substantial likelihood that [he] will commit a crime if released on parole"; and its "decision is contrary to written [Board] policy or procedure." The Board rejected Collins' contentions, affirming the panel's denial of parole and establishment of a sixty-month FET.

The Board found that the panel's determination—a preponderance of the evidence indicates a substantial likelihood that Collins would re-offend—was supported by his "minimal insight into [his] criminal thinking" that required additional programming and his extensive disciplinary infractions.  The Board found that Collins' claim, that he took full responsibility for the crime and that the panel failed to specify which programming he should complete to be viable for parole, only indicated an "initial effort at rehabilitation."  The Board acknowledged that parole is "presumptive," but that Collins' completion of his

---

[4]    The panel issued an amended decision which merely reflected the commencement of the FET date and that credits will reduce his prison time.

minimum sentence and "statutory standards" did not make him "suitable for parole release." Accordingly, the Board denied Collins' parole.

## II.

"[Our] scope of our review is narrow." Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 302 (App. Div. 2022). We will disturb an agency's decision

> only if we determine that the decision is "arbitrary, capricious or unreasonable" or is unsupported "by substantial credible evidence in the record as a whole." In determining whether an agency action is arbitrary, capricious, or unreasonable, we examine: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (citations omitted) (first quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980); and then quoting In re Carter, 191 N.J. 474, 482 (2007)).]

We are also "deferential to an agency's expertise." Ibid. Parole determinations, in particular, "are entitled to deferential review by our courts," and "[a] mere difference of opinion is not a basis for a court to overturn a parole decision." Acoli v. N.J. State Parole Bd., 250 N.J. 431, 454 (2022). Nevertheless, "when a parole decision is so far wide of the mark or so manifestly

mistaken under the governing statutory standard, intervention is required in the interests of justice." Id. at 455.

"[T]he Parole Board is 'the administrative agency charged with the responsibility of deciding whether an inmate satisfies the criteria for parole release under the Parole Act of 1979 [Act].'" Berta, 473 N.J. Super. at 302-03 (quoting In re Hawley, 98 N.J. 108, 112 (1984)). Although the Act was revised in 1997, Collins' parole is governed by the 1979 version of the Act that was in effect when he committed the crime in 1983. See N.J.S.A. 30:4-123.53 (1979). That version provides that the inmate "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released on parole at such time." Id. at 304 (alterations in original) (quoting Acoli, 250 N.J. at 455); see also N.J.S.A. 30:4-123.53 (1979).[5]

The Court defined "substantial likelihood":

> Assessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty. To

---

[5] Today, the Board "may deny parole if it is shown by a preponderance of the evidence that an 'inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed pursuant to [N.J.S.A. 30:4-123.59].'" Acoli, 250 N.J. at 455 n.12 (alteration in original) (quoting N.J.S.A. 30:4-123.53).

be sure, the mere 'potential' that an inmate if released may reoffend is not sufficient.  Only when the risk of reoffending rises to 'a substantial likelihood' may a parole-eligible inmate be denied parole.

[Acoli, 250 N.J. at 456 (quoting N.J. State Parole Bd. v. Cestari, 224 N.J. Super. 534, 550 (App. Div. 1988)).]

In making the parole release decision, N.J.A.C. 10A:71-3.11 requires the Board to assess twenty-four factors[6] "based on the aggregate of all pertinent

---

[6] N.J.A.C. 10A:71-3.11(b) factors are:

1. Commission of an offense while incarcerated.
2. Commission of serious disciplinary infractions.
3. Nature and pattern of previous convictions.
4. Adjustment to previous probation, parole and incarceration.
5. Facts and circumstances of the offense.
6. Aggravating and mitigating factors surrounding the offense.
7. Pattern of less serious disciplinary infractions.
8. Participation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration. This includes, but is not limited to, participation in substance abuse programs, academic or vocational education programs, work assignments that provide on-the-job training and individual or group counseling.
9. Statements by institutional staff, with supporting documentation, that the inmate is likely to commit a crime if released; that the inmate has failed to cooperate in his or her own rehabilitation; or that there is a reasonable expectation that the inmate will violate conditions of parole.

10. Documented pattern or relationships with institutional staff or inmates.

11. Documented changes in attitude toward self or others.

12. Documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior.

13. Mental and emotional health.

14. Parole plans and the investigation thereof.

15. Status of family or marital relationships at the time of eligibility.

16. Availability of community resources or support services for inmates who have a demonstrated need for same.

17. Statements by the inmate reflecting on the likelihood that he or she will commit another crime; the failure to cooperate in his or her own rehabilitation; or the reasonable expectation that he or she will violate conditions of parole.

18. History of employment, education and military service.

19. Family and marital history.

20. Statement by the court reflecting the reasons for the sentence imposed.

21. Statements or evidence presented by the appropriate prosecutor's office, the Office of the Attorney General, or any other criminal justice agency.

22. Statement or testimony of any victim or the nearest relative(s) of a murder/manslaughter victim.

23. The results of the objective risk assessment instrument.

24. Subsequent growth and increased maturity of the inmate during incarceration.

A-1944-23

factors." "The weight to be assigned to any one factor will depend on the unique history, background, and characteristics of the individual and the institutional record developed during years of incarceration." Acoli, 250 N.J. at 457.

Most importantly, "[u]nder the governing statutory and regulatory framework, once a defendant becomes eligible for parole, he or she is entitled to 'a presumption in favor of parole.'" Berta, 473 N.J. Super. at 304 (quoting In re Trantino (Trantino II), 89 N.J. 347, 356 (1982)). Thus, "the burden is on 'the State to prove that the prisoner is a recidivist and should not be released.'" Id. at 304-05 (quoting Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 197 (2001)). "Overcoming the presumption of parole is a 'highly predictive' determination which must take into account 'the aggregate of all of the factors which may have any pertinence.'" Id. at 305-06 (citation omitted) (first quoting Thompson v. N.J. State Parole Bd., 210 N.J. Super. 107, 115 (App. Div. 1986); and then quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 360 (1973)).

In Berta, we emphasized that "the parole release decision is fundamentally different from the decision made by a trial court when imposing the initial sentence." Id. at 305. Although the Board may consider the "'[f]acts and circumstances of the offense' as a relevant factor" under N.J.A.C. 10A:71-3.11(b)(5), "'the gravity of the crime' cannot serve as 'an independent reason

for continuing punishment and denying parole' under the 1979 Act." Ibid. (alteration in original) (quoting Trantino II, 89 N.J. at 373-74). "That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole." Acoli, 250 N.J. at 457.

III.

Collins argues the Board erroneously applied the 1948 Parole Act legal standard, instead of the 1979 Parole Act standard, by focusing on whether he was "suitable for parole" and finding that he only made an "initial effort at rehabilitation." The 1948 Act required the Board to focus on whether the incarcerated person "had served enough time in prison and been sufficiently punished in terms of both society's need for adequate punishment and the inmate's individual progress toward rehabilitation." N.J. Parole Bd. v. Byrne, 93 N.J. 192, 204 (1983). Whereas the 1979 Parole Act limited the Board's focus on punishment "to the rehabilitative prospects of the inmate and his likelihood of recidivism if released." Trantino v. N.J. State Parole Bd. (Trantino IV), 154 N.J. 19, 26 (1998). Collins asks this court to reverse the Board's decision because it denied him parole on the basis that he had not demonstrated "sufficient rehabilitation," the 1948 standard, thereby erroneously shifting the burden of proof to him. We disagree.

A-1944-23

Even though the Board's language—such as "initial efforts at rehabilitation" and Collins' "suit[ability] for parole"—is like language from the 1948 Act, the 1979 Parole Act allows parole boards to consider rehabilitation insofar as it addresses the risk of recidivism. Berta, 473 N.J. Super. at 323. We favor the Board's reply that its findings regarding rehabilitation addressed relevant factors such as Collins' attitudes towards himself and others, his mental health, personal goals and growth, his family support, and parole plans, all of which are relevant to a likelihood of recidivism. N.J.A.C. 10A:71-3.11(b)(11) to (13), (15). The Board's focus on Collins' rehabilitation was thus relevant to determining his risk of recidivism, the appropriate standard under the 1979 Parole Act.

We, however, agree with Collins that the Board's decision lacked substantial evidence in the record to deny him parole. The record does not support the Board's agreement with the panel's decision that he possessed "minimal insight into [his] criminal thinking"; had insufficient problem resolution necessitating further programming; his nineteen disciplinary infractions demonstrated "a propensity to commit indecent exposure infractions," and the facts of his crime made it substantially likely that he would commit a crime upon his release.

19

The Board correctly notes the hideousness of Collins' crimes. Yet, the weight of the record indicates he has expressed consistent remorse and responsibility for his actions. During the two-member panel hearing, Collins explained that "[he] was trying to be somebody [he] wasn't . . . [and was] trying to take control of the situation," because D.B. and A.B. were moving away, he believed that he would lose his son, and he was intoxicated at the time of the offense. Dr. Perry-Goffney noted Collins thought he was "being deprived of his relationship with [D.B.]" and saw A.B. "as challenging his masculinity." Further, throughout the hearing, he accepted full responsibility for his actions, admitting he "deserved everything that [he] got," explaining he prayed for A.B.'s family's understanding that he has changed, and expressed a desire to "help those . . . to not make the same bad choices as [he] did back then."

Regarding Collins' insufficient problem resolution, the Board overlooked evidence in the record showing his genuine efforts at rehabilitation; and failed to explain how his "initial effort[s] at rehabilitation" made him likely to recidivate, the primary focus of the 1979 Parole Act standard. See McGowan, 347 N.J. Super. at 565 ("[T]he Board [must] focus its attention squarely on the likelihood of recidivism."). The record demonstrates Collins' significant progress in rehabilitation during his almost forty years of incarceration. He

20

completed six therapeutic, two substance abuse and various religious and vocational programs; earned his GED; tutored fellow inmates; and is earning his associate's degree.

As to Collins' potential for recidivism, Dr. Perry-Goffney's testing revealed "a low risk for recidivism with a 20% chance of re-arrest and a 13.3% chance of reconviction within two years of release," and a moderate risk for future violence. Dr. Perry-Goffney opined that Collins' likelihood of completing parole was "good" given his educational progress, work experience, and family support. The doctor recognized there were potential concerns, like Collins' "marked distrust of others," "propensity to enter into abusive relationships and troublesome situations," and the possibility he "may stir up fractious encounters . . . [that] preclude a socially rewarding and consistent lifestyle." However, she still maintained he did not pose a substantial risk of re-offense upon release. The Board's failure to consider or reasonably refute this persuasive evidence in the record belies its decision denying parole.

The Board's reasoning about Collins' disciplinary history and his recidivism disregards relevant evidence in the record. He has been discipline-free since 2009, some fourteen years as of the panel hearing. Moreover, despite his indecent exposure offenses, his risk assessment evaluation statement that he

"was not attempting to be an exhibitionist" conforms with Dr. Perry-Goffney's opinion that his tendencies were due more to "carelessness, if not due to exhibitionist tendencies." Notably, Collins' risk assessment score for a sexual offense was a +2, which amounts to a 4.6% recidivism rate over the next five years. Thus, contrary to the Board's determination, his remote disciplinary infractions and his risk assessment report do not establish that he is substantially likely to re-offend if released.

We are constrained to conclude the Board's decision denying Collins' parole was arbitrary and capricious given that the record is replete with examples of his remorse, insight, and responsibility for his actions, and most significantly, the low chance of his likelihood to reoffend. As such, we remand to the Board to conduct a new hearing to adequately explain all relevant factors in determining whether the preponderance of the evidence establishes a substantial likelihood that Collins will reoffend. We do not retain jurisdiction because we anticipate that the Board will "act in good faith in fulfilling its responsibilities on remand" and will grant Collins parole if the evidence shows there is a substantial likelihood that he will not reoffend. Berta, 473 N.J. Super. at 321.

## IV.

Finally, we address Collins' contention that the Board improperly imposed a sixty-month FET by failing to overcome the twenty-seven-month FET presumption. He argues the Board's reasons for imposing the sixty-month FET were conclusory, relying on the same factors it denied parole which we determined in Berta was inappropriate. We agree.

Under N.J.A.C. 10A:71-3.21(a)(1), an incarcerated person serving a minimum term in excess of fourteen years is ordinarily assigned a twenty-seven-month FET after a denial of parole. However, N.J.A.C. 10:71-3.21(d) allows a three-member panel to establish a FET outside of the administrative guidelines if the presumptive twenty-seven-month FET is "clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of future criminal behavior." Yet, this standard is a "high threshold to vault" and a "twenty-seven-month FET [for people with murder convictions] . . . is not to be dispensed with for light or transient reasons." Berta, 473 N.J. Super. at 322-23. "[A]n extended FET must be based on substantial credible evidence in the record that objectively demonstrates that its duration directly relates to the amount of time necessary to address the reasons identified for denying parole." Id. at 328-29 (Geiger, J.A.D., concurring).

A-1944-23

The Board, through its affirmation of the three-member panel's recommendation, relied on the same reasons—the facts of Collins' offense, his institutional infractions (emphasizing the four serious infractions), and insufficient problem resolution—in denying parole. However, it failed to justify why a twenty-seven-month FET would be inappropriate given Collins' extensive rehabilitation and low risk scores. As such, the Board failed to meet the standard to establish a sixty-month FET. If on remand, the Board denies Collins parole, it must reconsider the FET.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

24